# EXHIBIT 30

*December 18, 2008 Deposition of Thomas P. Strain*

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, ATLANTIC COUNTY
DOCKET NUMBER F-10209-08

---

BANK OF NEW YORK as          :    DEPOSITION OF:
Trustee for the              :
Certificate Holders CWABS,   :    THOMAS P. STRAIN
INC. Asset-Backed            :
Certificates, Series         :
2005-AB3,                    :
                             :
    Plaintiff                :
                             :
  vs                         :
                             :
VICTOR and ENOABASI UPKE,    :
                             :
    Defendants               :

---

Thursday, December 18, 2008

---

R E P O R T E D   B Y:

NANCY J. SANTORELLA, Certified Court Reporter of the State of New Jersey, (License No. 1075) on the above date, commencing at 3:25 p.m. at the law offices of South Jersey Legal Services, 745 Market Street, Camden, New Jersey.

CAMPISE REPORTING, INC.
273 West Main St., Moorestown, N.J. 08057 - (856) 234-6646

THOMAS P. STRAIN

SUPERIOR COURT OF NEW JERSEY
CHANCERY DIVISION, ATLANTIC COUNTY
DOCKET NUMBER F-10269-08

BANK OF NEW YORK as
Trustee for the
Certificate Holders CWABS,
INC. Asset-Backed
Certificates, Series
2005-AB2,

    Plaintiff

vs

VICTOR and ENOABASI UPKE,

    Defendants

DEPOSITION OF:
THOMAS P. STRAIN

Thursday, December 18, 2008

REPORTED BY:

NANCY J. SANTORELLA, Certified Court Reporter of the State of New Jersey, (License No. 1075) on the above date, commencing at 3:25 p.m. at the law offices of South Jersey Legal Services, 745 Market Street, Camden, New Jersey.

---

### Page 2

APPEARANCES:

PHELAN, HALLINAN & SCHMIEG, LLP
By: BRIAN F. BLAKE, ESQUIRE
    For the Plaintiff

SOUTH JERSEY LEGAL SERVICES, INC.
By: ABIGAIL BROWN SULLIVAN, ESQUIRE
    For the Defendants

WILENTZ, GOLDMAN & SPITZER, P.A.
By: DASHIKA R. WELLINGTON, ESQUIRE
    For Thomas P. Strain

ALSO PRESENT:

JENNIFER SMITH, Paralegal
South Jersey Legal Services

---

### Page 3

INDEX

| WITNESS | EXAMINING ATTORNEY | PAGE |
|---|---|---|
| THOMAS P. STRAIN | Ms. Sullivan | 4, 31 |
|  | Ms. Wellington | 29 |

---

### Page 4

1     THOMAS P. STRAIN, having been duly sworn, was
2 examined and testified as follows:
3     MS. WELLINGTON: And before we begin I'd just
4 like to put a preliminary statement on the record just
5 for everybody's clarity and for Tom's clarity too.
6 Thomas Strain is here as a fact witness. Mr. Strain
7 is not a party to this litigation nor is his employer,
8 Full Spectrum Services. So just to clarify that he's
9 here today mainly as a fact witness.
10     MS. SULLIVAN: Okay. Thanks.
11 BY MS. SULLIVAN:
12 Q.   Mr. Strain, my name is Abigail Sullivan. I'm an
13 attorney here at South Jersey Legal Services and I represent
14 Victor and Enoabasi Upke. They are the homeowners in this
15 case. The case is a foreclosure case. And Mr. Strain, you
16 were subpoenaed here today; is that right?
17 A.   Uh-huh.
18     MS. WELLINGTON: Objection. Actually Mr.
19 Strain was not subpoenaed. He was served with, at
20 least what I have, which is a notice of deposition.
21 We agreed to have Mr. Strain appear because it's my
22 understanding there was an Order from Judge Todd --
23     MS. SULLIVAN: There was.
24     MS. WELLINGTON: -- saying that the notary was
25 to be deposed. So Mr. Strain is here pursuant to a

THOMAS P. STRAIN

Page 5

1  notice of deposition, although he is not a party to
2  this case.
3       MS. SULLIVAN: Okay. Thank you for clarifying
4  that.
5  Q. Mr. Strain, you're here based on a notice of
6  deposition; is that correct?
7  A. Yes.
8  Q. And did you have a chance to look at the notice of
9  deposition?
10 A. Yes.
11 Q. And do you understand what a deposition is?
12 A. Somewhat.
13 Q. Have you ever been deposed before?
14 A. No.
15 Q. Well, essentially what is going to happen today is I'm
16 gonna ask you questions and you're going to answer them under
17 oath. You have your attorney here today who will basically be
18 representing your interest and that of Full Spectrum Services
19 I guess. And in this deposition your answers are under oath.
20 So you understand what the penalty of perjury is?
21 A. (Witness nodding).
22      MS. WELLINGTON: You need to say yes verbally.
23 Q. Yes, that's one thing. All your answers need to be
24 verbal. That would be yes or no. Do you understand that?
25 A. Yes.

Page 6

1  Q. So you understand that you're swearing under the
2  penalty of perjury?
3  A. Yes.
4  Q. Are you taking any medications today that would affect
5  your ability to answer my questions?
6  A. No.
7  Q. And you are represented by counsel?
8  A. Yes.
9  Q. And she's here today?
10 A. Yes.
11 Q. And did your counsel tell you what to say today?
12 A. No.
13 Q. And did she tell you what to bring today?
14 A. Yes. I mean I brought myself.
15 Q. Did you bring any documents with you today?
16 A. No.
17 Q. And what documents did you review in preparation for
18 your deposition testimony today?
19 A. Nothing.
20 Q. Nothing? Okay. And who did you speak to in
21 preparation for your testimony today?
22      MS. WELLINGTON: And before you answer I just
23      want to caution you. You are not to disclose the
24      contents of any discussions that you may or may not
25      have had with counsel, which would include me or any

Page 7

1  other attorneys that you can identify. You can give
2  names but not the substance of any discussions.
3       THE WITNESS: Okay.
4  Q. And so who did you speak to in preparation for your
5  deposition testimony today?
6  A. Dashika and Brian.
7  Q. Did you speak to anybody else?
8  A. No.
9  Q. Did you speak to any non-attorneys?
10 A. No.
11 Q. Who is your employer, Mr. Strain?
12 A. Full Spectrum Services.
13 Q. And what is your position with your employer?
14 A. I supervise the process service department.
15 Q. And how long have you worked for Full Spectrum
16 Services?
17 A. About three and a half years.
18 Q. Where did you work prior to working with Full Spectrum
19 Services?
20 A. Ruhling's Seafood.
21 Q. What are your day-to-day duties with Full Spectrum?
22 A. Answer a lot of e-mails. I'm more or less like a
23 go-between between Phelan, Hallinan and Schmeig and our field
24 processors. I notarize affidavits, logging different things
25 in.

Page 8

1  Q. Do you acknowledge assignments?
2  A. Yes.
3  Q. And how many have you done for Phelan, Hallinan and
4  Schmeig?
5  A. I was notarizing maybe on an average of 50 a day.
6  Q. 50 assignments a day?
7  A. Yes. Could be less, could be more.
8  Q. When did you become a notary?
9  A. I believe it was February of maybe three years ago.
10 Q. Okay.
11 A. That would be almost three years ago this February.
12 Q. So February of 2005 is when you became a notary?
13 A. That does sound about right. No, I believe in '0 --
14      MS. WELLINGTON: Six.
15 Q. '06. I'm sorry.
16 A. -- 6, yeah.
17 Q. I apologize. And why did you become a notary?
18 A. Because the position that we're in we need an in-house
19 notary.
20 Q. And who needed an in-house notary?
21 A. Full Spectrum Services.
22 Q. And where is Full Spectrum Services located?
23 A. In Mount Laurel, New Jersey.
24 Q. And that's the office you work out of?
25 A. Yeah. I mean I've worked out of the Pennsylvania

## Page 9

1  office also.
2  Q.  And where is the Pennsylvania office located?
3  A.  JFK -- it's in One Penn Center. I don't know the
4  exact address.
5  Q.  And where is --
6  A.  Suburban Station.
7  Q.  Is your office next to Phelan, Hallinan and Schmeig's
8  office?
9  A.  Yes, we're in the same building.
10 Q.  What's the relationship between Hallinan -- I'm gonna
11 call it Phelan, Hallinan -- instead of saying Phelan, Hallinan
12 and Schmeig I'm just gonna refer to it as Phelan or the law
13 firm. Is that all right?
14 A.  Uh-huh.
15 Q.  What is your relationship with the law firm Phelan?
16 A.  We're a servicing company for them.
17 Q.  Do you service other firms?
18 A.  No.
19 Q.  Do you do any work for any other entity other than the
20 law firm?
21 A.  No.
22       MS. WELLINGTON: Wait. Just clarify. Are you
23 talking about notarizing services or work in general?
24       MS. SULLIVAN: Work in general.
25 A.  I mean we may get a rare request. So the company --

## Page 10

1  you know, so the company may Google like, you know, service
2  companies. We may get the requests here and there for
3  something like that, but that is even rare.
4  Q.  So you said you've acknowledged 50 assignments a day.
5  How many assignments would you estimate that you've
6  acknowledged?
7       MS. WELLINGTON: Are you asking over the time
8  frame that he's been a notary or a different time
9  frame?
10 Q.  Yes, since you've been a notary.
11 A.  I do not know but it would be a large number.
12 Q.  A very large number. What kind of training have you
13 had as a notary?
14 A.  Just by the notary course that is required before
15 being appointed as one.
16 Q.  And the notary course in which state?
17 A.  Pennsylvania.
18 Q.  Are you a notary in the State of New Jersey?
19 A.  No.
20 Q.  And why are you not a notary in New Jersey?
21 A.  I do not know.
22 Q.  But you do work in New Jersey; is that correct?
23 A.  Yes.
24 Q.  And how many years have you worked in New Jersey?
25 A.  Three and a half.

## Page 11

1  Q.  Are you a salaried employee?
2  A.  Yes.
3  Q.  And you're aware that as a notary you're a public
4  officer?
5  A.  Yes.
6  Q.  And you're aware that as a notary you're licensed that
7  way as a public officer?
8  A.  Yes.
9  Q.  And you're aware of the repercussions of false
10 notarizations?
11 A.  Yes.
12 Q.  What are they?
13 A.  I don't know the exact -- I just know that you have
14 to -- I don't know what the actual penalties are.
15 Q.  Well, do you think you can lose -- hold on one
16 second -- are you aware of the Notary Public Law?
17 A.  No.
18 Q.  Are you aware that there are some rules and
19 regulations that dictate what you need to do and not do as a
20 notary?
21 A.  I pretty much know that like -- like know what I can
22 and cannot notarize.
23 Q.  What sort of things can you not notarize?
24 A.  Like someone just can't mail me, a person I do not
25 know, may not mail me a signature and ask me to notarize it.

## Page 12

1  I have to be a hundred percent sure that it is that person's
2  signature.
3  Q.  Let me ask you, what's your educational background?
4  A.  I have a Bachelor's degree in business.
5  Q.  And how old are you, sir?
6  A.  27.
7  Q.  And are you aware that there's a $10,000 bond required
8  to be posted prior to becoming a notary?
9  A.  I may have been aware of that at the time. Right now
10 I do not know.
11 Q.  Oh, okay. Well, did you post that bond?
12 A.  Not myself.
13 Q.  Do you know who might have?
14 A.  I do not know.
15 Q.  Might it have been the law firm?
16       MS. WELLINGTON: Don't speculate.
17 A.  I do not know.
18 Q.  What is your standard practice for acknowledging these
19 assignments?
20 A.  They're handed to me and I just make sure the
21 signature on there is whoever signs it. The people at the
22 attorneys that do sign it I am familiar with and I just make
23 sure that's their signature and I will notarize it.
24 Q.  Is there an office handbook or anything like that at
25 the firm that details the process for acknowledging these

JAN-09-2009 FRI 05:36 PM SJLS	FAX NO. 8563389227	P. 05/15
Case 1:09-cv-01710-JHR-JS   Document 31-34   Filed 09/08/2009   Page 6 of 11

THOMAS P. STRAIN

Page 13

1 assignments?
2 MR. BLAKE: Can I just object because you
3 referred to the firm rather than his employer. So I
4 just want to clarify when you said the firm, are you
5 sticking with your prior definition of the law firm
6 being Phelan, Hallinan and Schmeig?
7 Q. I'll back up. Is there a handbook at the -- I just
8 want to call your employer FSS, is that okay, Full Service
9 Spectrum?
10 A. Yes.
11 Q. Is there a handbook at FSS for detailing the process
12 for --
13 A. I do not know.
14 Q. Do you know whether or not there's one for the law
15 firm?
16 A. I do not know.
17 Q. The assignments that you've done, are they generally
18 the same?
19 MS. WELLINGTON: I'm gonna have to ask you to
20 clarify that question. It's a little vague.
21 Q. Well, how many pages are these assignments generally?
22 A. I believe, I'm not a hundred percent sure, but a
23 couple.
24 Q. Are the witnesses the same in --
25 MS. WELLINGTON: Well, I have to object because

Page 14

1 there's no foundation for that. We don't know. You
2 have to instill to him what a witness is.
3 Q. Well, let's talk about the assignments. What do these
4 assignments generally contain?
5 MS. WELLINGTON: I'm gonna only object on the
6 basis that Mr. Strain is here to testify as a notary,
7 not necessarily someone who has knowledge of the
8 contents of the assignment.
9 MS. SULLIVAN: Well, I'll ask questions about
10 that.
11 Q. Who creates these assignments?
12 A. I do not know.
13 Q. You do not create the assignment?
14 A. No.
15 Q. Do you read the assignment before you notarize it?
16 A. No.
17 Q. You do not?
18 A. I mean I notarize the signature.
19 MS. WELLINGTON: Here's the objection that I'm
20 gonna put on the record. Mr. Strain is here
21 testifying as a notary. A notary is not required
22 under Pennsylvania law to understand the contents of
23 legal documents that they are notarizing. It would in
24 fact be impossible in many instances for them to
25 understand the technical legal aspects of the

Page 15

1 documents they're notarizing. As a notary his sole
2 requirement is to verify that the signature on the
3 document is in fact the actual signature of the person
4 stated on the document. So to the extent that you're
5 asking him about the contents of assignments or to
6 make any legal determination as to the validity of the
7 assignments, he is not qualified to testify as to
8 that.
9 MS. SULLIVAN: Well, my response is that
10 absolutely he's qualified. As a notary there are
11 rules and regulations as to acknowledging assignments,
12 which is different than notarizing. And that's an
13 area that I'm gonna delve into as there are different
14 requirements for acknowledging an assignment as
15 opposed to merely notarizing a signature.
16 MS. WELLINGTON: Okay. So that maybe something
17 that we need to go off the record and just get that.
18 I'd like to see what exactly you plan on asking him
19 and then we can set the parameters that way.
20 MS. SULLIVAN: Off the record.
21 (Discussion off the record).
22 MS. WELLINGTON: What I am objecting to is not
23 language that has to be included in the acknowledgment
24 of the assignment. My objection is to this witness
25 testifying as to the contents of the assignment, the

Page 16

1 legal aspect or the contents of the assignment. You
2 can ask him about the language required to be in the
3 acknowledgment.
4 MS. SULLIVAN: That's all I'm doing, right.
5 MS. WELLINGTON: That's excellent. My
6 objection is to him testifying or giving any testimony
7 as to what the assignment meant, who it was from, if
8 it's valid to go from A to B. He's only permitted to
9 testify to things that are A, B in the
10 acknowledgement.
11 MS. SULLIVAN: I think we're in agreement.
12 Q. So what I'm asking you about is the actual language
13 that you use for acknowledging these -- when I say
14 acknowledging, the assignment, meaning the actual -- there's a
15 signature and all that area, the acknowledgment section of an
16 assignment. And so why don't I just go to D-3 -- well,
17 actually before I do that, just generally speaking here --
18 MS. WELLINGTON: Do you understand what she
19 says when she says acknowledgment?
20 THE WITNESS: That I'm acknowledging the
21 signature in the assignment.
22 MS. WELLINGTON: If you don't understand
23 something, that's okay.
24 Q. That's what's meant by the acknowledgement. When
25 you're doing these assignments, and you've done many of them,

JAN-09-2009 FRI 05:36 PM SJLS    Case 1:09-cv-01710-JHR-JS   Document 31-34   FAX NO. 8563389227  Filed 09/08/2009   Page 7 of 11   P. 06/15

THOMAS P. STRAIN

### 17

1 is the acknowledgement, and that's the part that you're -- you
2 know what an acknowledgement is, right?
3 A. (Witness nodding).
4 Q. Are they different? Have you noticed that they're
5 different?
6 A. I am under the impression that they are the same or at
7 least along the same lines.
8 Q. Do you create the acknowledgment language?
9 A. No.
10 Q. And I think that you stated before you do not know who
11 does; is that correct?
12 A. I do not.
13 Q. Now, in other assignments are the same people acting
14 as witnesses?
15    MS. WELLINGTON: Again, I object. Lack of
16    foundation as to what you mean by witness.
17 Q. Okay. Generally in assignments are there witnesses
18 that observe the signatures?
19 A. I'm still not really following.
20 Q. How many people generally sign an assignment?
21 A. I believe just one.
22 Q. And who would that be?
23 A. That would be -- in this case it would be like Frank,
24 how he signed the mortgage and then it would be myself after
25 that. Like I would be notarizing it. So it would be two

### 18

1 signatures.
2 Q. Two signatures. Have you noticed in these assignments
3 that there are ever corporate seals?
4    MS. WELLINGTON: And I want to caution the
5    witness, again, because you're here testifying as a
6    fact witness I don't want you to guess or speculate.
7    So only tell us what you know.
8 Q. Have you noticed that there are corporate seals on any
9 of these assignments that you've done before?
10 A. I have not noticed.
11 Q. Do you notice whether or not there's any kind of
12 corporation or corporate action in any of the assignments?
13 A. I don't really know.
14 Q. And are you aware of the requirements of
15 acknowledgement, what the rules are for acknowledgment in the
16 State of Pennsylvania?
17 A. I am not.
18 Q. And are you aware of what the requirements or
19 acknowledgements are in the State of New Jersey?
20 A. No.
21 Q. And are most of the acknowledgements that you do for
22 assignments, and I'll be specific, are they for Pennsylvania
23 properties?
24 A. I do not know.
25 Q. Do you know whether the majority of these

### 19

1 acknowledgements you do are for New Jersey properties?
2 A. Do not know.
3 Q. That's fine. Do you know how many assignments that
4 you've acknowledged for this same plaintiff before?
5 A. I have no idea.
6 Q. And do you know if you've done any other
7 acknowledgements for other assignments for other securitized
8 trusts?
9    MS. WELLINGTON: I'm just gonna object because
10   it's assuming facts not in evidence or lack of
11   foundation. You haven't established with this witness
12   if this is assignments from a securitized trust.
13   You're asking about other securitized trusts. And
14   he's simply not qualified to testify about those
15   things.
16   MS. SULLIVAN: We can come back to that.
17 Q. Well, I'm gonna show you this assignment. I'm gonna
18 show you what's been marked previously as D-3. And I'm just
19 gonna show you. It's two pages here. I want you to take a
20 look at that. I believe you testified that you did not look
21 at this document in preparation for your testimony today; is
22 that correct?
23 A. Uh-huh.
24 Q. That would be --
25 A. I don't know if I seen this or not. I mean obviously

### 20

1 at the time when I notarized it I did see it, but obviously I
2 see a lot of these.
3 Q. Yes. But your testimony was that you reviewed no
4 documents for your testimony today; is that correct?
5 A. Yes.
6 Q. So you didn't see this before you prepared for this
7 deposition?
8 A. No.
9 Q. I'll just bring your attention to the second page
10 where it says "On 03/14 before me." I believe that says
11 Thomas Strain. Is that your handwriting?
12 A. No, it is not.
13 Q. And then at the very bottom where it says "Witness my
14 hand" -- I'm reading it upside down, I apologize. "Witness my
15 hand and official seal," I think it says Thomas Strain. Is
16 that your handwriting?
17 A. Yes.
18 Q. Do you recall this assignment?
19 A. No, definitely not. You know, I've had so many of
20 them done.
21 Q. Sure. Well, let me ask you, you said over here that
22 the name Thomas Strain, this is above the signature -- not the
23 signature line but the paragraph before, that the Thomas
24 Strain is not your handwriting. Is the 03/14/08 your
25 handwriting?

Page 21

1  A.  No.
2  Q.  Do you recognize the handwriting?
3  A.  I do not.
4  Q.  Do you know what date you notarized this document?
5  A.  I do not.
6  Q.  And you've testified earlier that you did not create this document?
8  A.  I did not.
9  Q.  Who gave you this document?
10 A.  I am not even sure.
11 Q.  Who usually gives you these assignments?
12 A.  It may have been John Capparelli.
13 Q.  Is Mr. Capparelli an attorney?
14 A.  No. Frank Hallinan probably gives it to him. I don't want to even say because I don't know what the procedure is.
16     MS. WELLINGTON: If you do not know don't make it up.
18     THE WITNESS: Yes.
19 Q.  Did Francis S. Hallinan give it to you?
20 A.  I do not know.
21 Q.  Has Francis S. Hallinan ever given you assignments to acknowledge?
23 A.  I don't know.
24 Q.  You don't remember or you don't know?
25 A.  I don't remember. Same thing pretty much.

Page 22

1  Q.  Let's go back to your procedures in doing these kinds of acknowledgements. Let's say Mr. Capparelli – is that the gentleman's name that you mentioned before?
4  A.  That's who I said may have given it.
5  Q.  May have. Let's imagine an instance where he would have given you an assignment to acknowledge. Would the person whose signature was above, would that person be in the same room with you when you acknowledged the signature?
9  A.  No.
10 Q.  And why is that?
11 A.  Just because they may not be. I know for a fact that that is Frank Hallinan's signature.
13 Q.  And how do you know that is his signature?
14 A.  Just from seeing it, being acquainted with him.
15 Q.  Have you ever seen him sign something in your presence?
17 A.  Yes.
18 Q.  And over here it says "Francis S. Hallinan, Assistant Secretary and Vice President of Mortgage Electronic Registration Systems, Inc. as a nominee for America's Wholesale Lender, it's successors and assigns." In what context do you know Francis S. Hallinan?
23 A.  What do you mean what context? Elaborate.
24 Q.  Well, how do you know him? How do you know Francis S. Hallinan?

Page 23

1  A.  He's one of my bosses. I mean I see him around the office.
3  Q.  And when you say he's one of your bosses, you mean he works for Full Spectrum Services, FSS?
5  A.  Yeah, I mean he's one of the owners of it.
6  Q.  And how many years have you worked with Francis S. Hallinan?
8  A.  Three and a half, give or take a few months or whatever.
10 Q.  Do you work in the same building as Francis S. Hallinan?
12 A.  On occasion. Depends. You know, he may be in another office I may be.
14 Q.  So Francis S. Hallinan is an attorney; is that correct?
16 A.  Yes.
17 Q.  And Francis S. Hallinan is a part owner of FSS?
18 A.  Yes.
19 Q.  Now, this assignment indicates that Francis S. Hallinan is an Assistant Secretary and Vice President of Mortgage Electronic Registration Systems; is that correct? I'll show that to you right here.
23 A.  I only -- yes, as far as that says.
24 Q.  What kind of verification did you have when you were making this acknowledgment that Francis S. Hallinan was a Vice

Page 24

1  President and Assistant Secretary of Mortgage Electronic Registration Systems?
3  A.  Just from being with the company for so long, word of mouth. I just know.
5  Q.  You say just know. Who told you?
6  A.  I do not know.
7  Q.  Is Mortgage Electronic Registration Systems a company such as FSS, that is, works in relationship to the law firm?
9     MS. WELLINGTON: Don't speculate if you don't know.
11 A.  I was gonna say, I do not know.
12 Q.  What is your basis of knowing that he is an Assistant Secretary and Vice President of Mortgage Electronic Registration Systems?
15 A.  I do not know.
16 Q.  Are there other people that you've notarized for who are Assistant Secretary and Vice President of Mortgage Electronic Registration Systems?
19 A.  I'm not sure.
20 Q.  When you look at these acknowledgements, or I'm sorry, these assignments, do you read the front page to see what basically the bulk of the document says?
23 A.  No.
24 Q.  What do you concern yourself with in these assignments?

JAN-09-2009 FRI 05:38 PM SJLS                    FAX NO. 8563389227                    P. 08/15
Case 1:09-cv-01710-JHR-JS    Document 31-34    Filed 09/08/2009    Page 9 of 11

THOMAS P. STRAIN

Page 25

1  A.  The signature.
2  Q.  Now, I'm gonna go over here now to the second page
3  where it says "On March 14th, '08 before me, Thomas Strain, a
4  Notary Public, personally appeared Francis S. Hallinan,
5  Assistant Secretary and Vice President, who proved to me on
6  the basis of satisfactory evidence to be the person whose name
7  is subscribed to the within instrument and acknowledged that
8  he/she executed the same in her authorized capacity and that
9  by her signature on the instrument the entity upon behalf of
10 which the person acted executed the instrument." Why did you
11 acknowledge Francis S. Hallinan to be a she when he was a he?
12 A.  I do not know.
13 Q.  Is it your testimony that Francis S. Hallinan is a he?
14         MS. WELLINGTON: Objection. He absolutely has
15     given no testimony as to the gender identity of Mr.
16     Hallinan.
17         MS. SULLIVAN: Well, I think he's referred to
18     him as Frank and has said he before.
19 Q.  So is it your testimony that Francis S. Hallinan is a
20 male?
21 A.  He is.
22         MS. WELLINGTON: Perhaps I think the confusion
23     is is that instead of asking him if it is his
24     testimony that, you can just ask him the question is
25     he a man and then that he can answer. We won't run

Page 26

1  into problems of whether or not it's mischaracterizing
2  previous testimony or whether it's testimony that
3  hasn't been given. I think that's where the problem
4  for me is coming up.
5  Q.  He's a guy, right?
6  A.  He is.
7  Q.  When you've done assignments in the past have you
8  noticed that there are errors?
9  A.  I have not. I mean I don't -- I don't know if I've
10 noticed before.
11 Q.  Have you made corrections when you've seen errors?
12         MS. WELLINGTON: Well, again --
13 Q.  Let me back up. Let me back up. Have you ever
14 noticed errors in these documents before?
15 A.  I'm not sure.
16 Q.  So you don't recall ever --
17 A.  Yeah, exactly.
18 Q.  Is it your understanding that the section I just read
19 to you starting from March 14th and this whole paragraph here,
20 and I'll let you look at that again, is that how you typically
21 acknowledge these assignments, with that kind of language?
22         MS. WELLINGTON: And I don't want to -- again,
23     these are only facts. So I don't -- questions like
24     typically trouble me because I don't want you to start
25     getting into what you typically do. I really just

Page 27

1  want you to talk about what you did in this case.
2         THE WITNESS: You want me to -- I mean I don't
3     know. I just know about the signature.
4  Q.  Do you feel this is the right way to acknowledge an
5  assignment, with that kind of language?
6         MS. WELLINGTON: Object to the form of the
7     question, the right way.
8  Q.  Is it your understanding with your training as a
9  notary and your understanding of what needs to be acknowledged
10 in an assignment because you've had the training; is that
11 correct?
12 A.  I'm losing you.
13 Q.  I'll be real simple. Based on your training as a
14 notary is it your understanding that this language is correct
15 from your standpoint as a notary in order to effectuate an
16 acknowledgment of this assignment?
17 A.  I'm not exactly sure. I did think it was.
18 Q.  Okay, that's fine.
19 A.  Aside from the her.
20 Q.  Sure.
21         MR. BLAKE: Nice save.
22         MS. SULLIVAN: Let me just take one minute.
23         (Brief recess).
24 Q.  I'm just gonna back up again about that error. Is it
25 your -- well, specifically to this assignment, is it your

Page 28

1  testimony that Francis Hallinan never appeared before you that
2  day?
3  A.  I do not know.
4  Q.  Did he ever in making these assignments?
5  A.  I am not sure.
6  Q.  You don't remember if he ever appeared personally
7  before you?
8  A.  I don't recall. I've been working there for, you
9  know, three and a half years and this was a long time ago.
10 Q.  Has he ever come up to you and said hey, I need you to
11 acknowledge this?
12         MS. WELLINGTON: I'm gonna object to only asked
13     and answered because he has said that he does not
14     know. So I don't think any amount of prodding is
15     going to make him know.
16 Q.  Have other attorneys given you assignments to
17 acknowledge?
18 A.  I'm not sure.
19 Q.  So the only person that you recall, and I've already
20 forgotten his name, was Mr. Capparelli?
21 A.  All the -- all the -- he is not an attorney. He
22 doesn't do the assignments. He's just someone who may, you
23 know, give me them from Frank, pretty much dropping something
24 off to me.
25 Q.  I see.

JAN-09-2009 FRI 05:38 PM SJLS   Case 1:09-cv-01710-JHR-JS   Document 31-34   Filed 09/08/2009   Page 10 of 11   FAX NO. 8563389227   P. 09/15

THOMAS P. STRAIN

29

1 A. He has nothing to do with it.
2 Q. He delivers them to you?
3 A. Yes.
4 Q. I see. I see. And it's your testimony that you
5 average about 50 of these a day?
6 A. That's not an exact number. I do not know.
7 Q. Yes, right.
8 MS. SULLIVAN: I don't have any other
9 questions.
10 BY MS. WELLINGTON:
11 Q. I just have a couple of follow-up questions for you.
12 And if we could get D-3 back in front of him. And, again,
13 these are just clarification questions. First, I just want to
14 make sure that we have clearly established you have met Frank
15 Hallinan, Francis Hallinan in person; is that correct?
16 A. Yes, many times.
17 Q. You are familiar with Frank Hallinan --
18 A. Yes.
19 Q. -- as an individual person?
20 A. Yes.
21 Q. You are familiar with his signature?
22 A. Yes.
23 Q. And you've testified that you have seen him on
24 occasion actually sign a document?
25 A. Yes.

30

1 Q. So you have personal knowledge of his signature?
2 A. Yes.
3 Q. Looking at D-3, sitting here today are you able to
4 identify the signature above the typewritten name Francis S.
5 Hallinan as the signature of the Francis S. Hallinan you know?
6 A. Yes.
7 Q. We talked about the word her as opposed to him in the
8 acknowledgement paragraph. Does that error alter the fact
9 that this is Frank Hallinan's signature?
10 A. No.
11 Q. You testified that you worked at what we were calling
12 FSS, Full Spectrum Services, and you also testified that there
13 is a relationship between FSS and Phelan, Hallinan and
14 Schmeig, the law firm, which we were also calling it the law
15 firm?
16 A. Yes.
17 Q. In your capacity with FSS, in your capacity as notary
18 were you aware that certain attorneys at the law firm were
19 authorized to sign assignments of mortgage?
20 A. Yes.
21 Q. And in your capacity as a notary were you relying on
22 that knowledge when you notarized these assignments?
23 A. Yes.
24 Q. Did you notarize assignments for any entity other than
25 Phelan, Hallinan and Schmeig?

31

1 A. No.
2 Q. Did you do any other notary work outside of Phelan,
3 Hallinan and Schmeig?
4 A. No.
5 Q. Were there any other attorneys that you notarized
6 documents for outside of Phelan, Hallinan and Schmeig?
7 A. No.
8 Q. So all of the attorneys that you notarized for were
9 people that you were personally familiar with?
10 A. Yes.
11 MS. WELLINGTON: I have no further questions.
12 BY MS. SULLIVAN:
13 Q. Just one other. You testified that there are some
14 people who are authorized to sign these assignments; is that
15 correct?
16 A. Yes.
17 Q. Is everyone authorized to sign these assignments at
18 the law firm, all the attorneys I mean?
19 A. I'm not sure.
20 Q. Who's authorized to sign these assignments?
21 MS. WELLINGTON: And just I'm gonna caution you
22 off the top of your head I don't want to guess and get
23 the wrong people.
24 A. I don't know.
25 Q. How do you know there is authorization if you don't

32

1 know who's supposed to be authorized?
2 MS. WELLINGTON: I don't understand that
3 question.
4 Q. You said that you know there are some people who are
5 authorized to sign and some people who aren't authorized to
6 sign; is that right?
7 A. Yes.
8 Q. And then I asked who's authorized to sign and you said
9 you don't know?
10 A. Yes. I mean I can't name --
11 Q. Are we talking about hundreds of people who are
12 authorized to sign?
13 A. I'm not sure.
14 Q. Are we talking -- can you name a few people?
15 A. I cannot.
16 Q. Can you name one person?
17 A. Francis Hallinan.
18 Q. Don't forget the S. And anybody else other than
19 Francis S. Hallinan?
20 A. I'm not sure.
21 MS. WELLINGTON: I don't want you to -- I don't
22 want him speculating. That's fine.
23 MS. SULLIVAN: I don't have any other
24 questions.
25 (Deposition concluded at 4:10 p.m.)

33

## CERTIFICATE OF OFFICER

I, NANCY J. SANTORELLA, a Certified Court Reporter of the State of New Jersey, do hereby certify that prior to the commencement of the examination the witness was duly sworn by me.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the date, time and place aforementioned.

I DO FURTHER CERTIFY that I am neither a relative nor employee, nor attorney or counsel to any parties involved; that I am neither related to nor employed by any such attorney or counsel, and that I am not financially interested in the action.

_____ C.C.R.
NJ C.C.R. License No. XI-01075